The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced, and the times will be as allotted to counsel. The first case today is United States v. Schulz-Chan Appeal No. 182232 United States v. Sun Jun Wang Appeal No. 182233 United States v. Schulz-Chan Appeal No. 191910 United States v. Sun Jun Wang Appeal No. 191911 Thank you. Good morning. Attorney Horstman, please proceed with your argument. Thank you, Your Honor. May it please the Court, my name is Pete Horstman. I'm representing both Mr. Wang and Mr. Chan for purposes of oral argument. If you can, please speak as loudly as possible because I'm not hearing you too well. I'm sorry, is that better? It's better, yes. Okay. I'm representing both Mr. Chan and Mr. Wang for purposes of oral argument. They have filed joint briefs in this matter, and the issues that we have raised have, for the most part, are symmetrical with each other. I'd like to start with the sufficiency of the evidence argument, the Rule 29 issue, because I think that really is where the rubber hits the road here in terms of a case. The classic indication, inference, clue, as to an insider trading case is usually the happy coincidence that someone makes a well-timed purchase of stock, followed by a happy increase in the value of the stock, and sells it after a very short period of time for a nice, happy profit. None of that is really what happened here. This is a mishmash of transactions that some were well-timed, some were held on for too long. There's nothing that really meets the indicia here of the happy coincidence that I just described. I think the problem with that is the government has stacked too many inferences upon each other as Judge Turea indicated in his dissent in, I believe it's pronounced, Mamie Masonette. I just think this is where plausible inferences may have limited significance. There is very little here in terms of actual evidence of insider trading. Counsel, I'm sorry to interrupt you, but are you familiar with our Negron Sostra case? I don't have it in front of me, and I've looked at… It establishes the factors that have to be proven by the government to establish this crime that we have before us. I wasn't going to ask you to go down there and tell me which ones you believe have not been met by the government. Well, the factors I was going to go through were the Larrabee factors, so I think that hopefully there's some overlap there. The Larrabee factors are fine. Okay. The Larrabee factors are… The factors have not been met by the government specifically. Specifically, I don't believe they've met the access element to the same degree as Larrabee. Obviously, they met the relationship… You mean the tipper did not have access to the information here? He had access to MNPI. There's no question about it. But for Merrimack, the government never identified what that MNPI was. He had a code that allowed him to get some data. We don't know what data was available at a particular time. We don't know what that data was, and the government had the burden here of proving it. We have this broadening timeframe that the government adopted here of over eight months where we had no way of verifying what information was available to Mr. Wong at any given time, and the government had the burden. Moving on with the factors… I'm sorry, but didn't he have access to data and the testimony from his supervisor was that the nature of the statistics that he could have made reasonable inferences about the success of the trials, the drug trials? And that's exactly where… The testimony? That was the testimony, but we think that's where the testimony fails, Your Honor, because data is not enough. It starts with the second superseding indictment, which basically describes the data as data including but not limited to data. That's my paraphrase. Government's closing argument, they mentioned clinical data, page seven. But data from which you could reasonably infer the successful drug trials, I don't understand why you're saying that's not sufficient. Thank you, Your Honor. Counsel, is that the only factor you say hasn't been met, or do you have other ones? Well, if I can respond directly to Judge Thompson's question, I think that's sort of where we got sidetracked. Yes, Mr. Wong's supervisor did testify that he had access, and yes, he testified that he could have determined, made some determinations based on some of the data, but we still don't know what that data was and when it was coming in, because remember, the big issue here is that this is a closed study group. The testimony was that the nature of the data was such that you could discern what you would need to know to learn that the study was positive so that you would trade on it. Now, if you wanted to put forward evidence to undermine the credibility of that statement, that testimony you could have, so I don't fully understand why. It's not as if the testimony just said it's data, but I don't know how material the data was. The testimony was the data was directly revealing of the thing you would need to know to trade on it, and if you wanted to show that that testimony shouldn't have been believed, you could put forward evidence. The jury could then reject that testimony, but as it is, the testimony itself would appear to cover exactly what it needed to cover. Well, we did drill down on that, Your Honor, at trial, and I think you'll find in our reply brief the citations to this. It wasn't so much that there was information available to Mr. Wong that he could have predicted the lifespan of people from. It was that, at best, he had access to what cohort the individual patients were in, and that doesn't tell you day to death, and all of the Merrimack witnesses testified, and we asked him this question, all of the Merrimack witnesses testified that the results were not statistically significant until the 305th death, and in his closing argument, my brother, the assistant US attorney, even said, he acknowledged at page seven of the closing arguments that the results were not significant until the final data lock happened, which wasn't until April, and that's why we, and this gets into variants, that's why we were defending the April, the May 1st public announcement as if it was an event, not a moving target that started back in August of 2013 and made its way to May 1st. The problem with the government's case on its data analysis is we don't even know that Wong had dates of death. We don't know that that was the raw data that was coming in on any particular point in time, and without the date that they started on whatever cohort they were in and the date of death, you couldn't make the critical calculation as to whether or not the drug was working for any particular cohort. Compare that with what's out there in the public, and this is what Mr. Chan testified to and what Merrimack's SEC filings corroborated, was that this was a study that was supposed to finish in the last quarter of 2013. They extended it, and then they extended it again for two quarters, so for half a year, the public and someone with Mr. Chan's knowledge could certainly draw the inference that people were living longer. This was a survivability study. Is the argument that he had non-public information but it was not material? The argument is that all the government proved is that he had testimony. I respectfully disagree. That was Bellinger's testimony. They had access to it. It was non-public in the sense that he may have known particular patients and what cohort they were in. That was certainly material non-public information, but that was certainly non-public information, but whether it was material or not. You said it was not material? Is that what your point is? What cohort a particular patient is in is not material and would not have influenced Mr. Chan into purchasing Merrimack one way or the other. Do you think that particular argument in your Rule 29 motion? Exactly. We challenged materiality right from the start in our Rule 29 motion, and we filed several motions. I'm sorry I can't tell you which one it's in right now. It may be in all of them, but materiality was our focus all along, particularly because we knew we were dealing with MM-121 and MM-302, which were misleading to us. There was no notice to us that MM-398 was going to be an eight-month conspiracy as opposed to a one-month conspiracy. This is a variance argument. This is a variance argument. I'm trying to get as much in here as I can, but with respect to both arguments, the fact... In response to Judge Turway's question, is the materiality of the non-public information the only aspect in which the government failed to meet its case under Larrabee? Under Larrabee, yes, but I do think Judge Turway's dissent in Miami-Masonet is worthy of consideration here because it quite simply is one inference after another after another, and when this dovetails into variance, we're asking the court to consider what evidence would not have come in had this case been properly indicted by the government and tried without MM-121, without 302, and without those six months of activity. I think it's more circumstantial evidence, which shows that there was apparent access to the information, and you have left out the other elements like relationship between the tipper and the tippeek, the contact of the timings, the timing with the trades, and the pattern of the trades, and the attempts to conceal. All this taken together would seem to me to make a fairly strong case for the government. Well, let me do this. In terms of the timing of the contact, there was never anything that approached Larrabee. Larrabee, there was a one-minute difference between the time that Larrabee received the information and he tipped his tippee. At most, in the Akibia transaction, there was half a day that went by between the time that Mr. Turway... But it's not a minute, and it may be just casual contact between two friends. The timing of the trades is really interesting because we're talking about limit orders. The evidence in this case was that both Mr. Chan and Mr. Wong engaged in limit orders. Limit orders are not indicative of a criminal conspiracy because all it shows is that an amount. Here, when you have limit orders, it affects the timing of the trades, and particularly with respect to the April trade because that was the first one that was rejected, and then Mr. Chan had to place another limit order in order to accomplish the transaction. I don't think that's even close to Larrabee. I've talked about the pattern. The pattern is nothing like it was in Larrabee, and the government essentially concedes this in its brief. You have bank transactions that are suggestive of some type of nefarious activity by Mr. Wong's withdrawals, but then Chan takes the same money. So, Wong takes all this care to make sure I understand two things. One is, could you just repeat for me exactly what your materiality argument is? What was the gap in the evidence with respect to the materiality of the non-public information that the supervisor testified he had access to? So, in other words, granting that he had access to it, whether you dispute that or not, you're contending to us that that information was not material. In what respect was it not material? Our argument is the broad data, preliminary data, data including not limited to data, can never be material because it's not specific enough to identify with any notice to a defendant. It's constitutionally defective. There's no notice to the defendant of what the information was and was supposedly done by the tippee in order to gain information in order to pass it on to the tipper, the tippee in this case, which is alleged to be Mr. Chan and Merrimack. With respect to the variant argument, could you just explain for me, your position seems to be with respect to the, I think it's the M398 study, is that the right number? Yes. That you didn't have notice of that starting as early as November 2013 from the face of the indictment, is that right? That's correct. Okay. On your view, what did the indictment suggest the start date for the conspiracy with respect to M398 was if it was not November 2013? April of 2014. And why would that be the right date to infer from the face of the indictment? Well, the indictment doesn't use the word shortly, but the government's trial brief does. And that's where I think we're entitled to infer that it wasn't eight months before, it wasn't four months before, it wasn't even two months before, but it was when that particular information was received. And remember, Mr. Wong didn't receive it until April 19th. Just from the face of the indictment, what does the indictment suggest the start date was as to the M398? Shortly before May 1st, the public announcement. That's the inference. And it's... Walk me through the text. Why does that inference arise from the face of the indictment shortly before? Because I would refer the court to my consecutive versus concurrent argument. These charges are set up, these allegations are set up consecutively, not concurrently. They're set up as one occurs in November of 2013, one occurs in December of 2013, and one occurs in December of 2013. And the information that is exchanged is obviously before each public announcement. And the government in this case was like an airline pilot. There was a course change, and you have to let air traffic control know that there's a course change. And they never did that here. They have the burden. It's not up to us to figure out what the government's doing. That's time, Judge. Thank you for your consideration, unless you have further questions. I have a question that I would like to ask you about this timing, because during the night that Chan worked at home in his laptop, that was on August 19th, I believe. He made a purchase roughly an hour and 45 minutes after receiving the email from Cary with information about the safety data on the OO11 study. Now, how do you answer to that as far as timing? Well, the timing is obviously relevant, but he had already purchased a Kibia stock two weeks earlier, and it was a perfectly legal purchase. So he clearly already made up his mind that this was a good stock. Once again, it was a limit order, so he didn't know whether it was going to be accepted or not. And if someone's going to be held liable for insider trading on their third day of work based on an email that doesn't identify itself as containing material, non-public information, and contains an article, a Wall Street article that was public information, I mean, it's just not fair. It is not fair for the government to leave the evidence like that Mr. Chan that, you know, to have his co-workers walk in and say they sent a material non-public information on the third day of work in an email that didn't identify it as material non-public information. It's just not fair. Thank you. This is directed to IT. I have all kinds of things on my screen that are blocking my view. And the second thing is, if there's any way that the sound can be raised on this so I can hear people better. Hello? Judge, I'm going to make sure they do that for you. Yeah, if somebody looks at my screen, I have a message from somebody else, I don't even know who it is. That went away, yeah. And then I have a strip that goes across the bottom and it blocks off Judge Barrett, which might not be bad, but I would just as soon have everybody block. Byron? Ah, excellent. Thank you so much. I knew you could do it. All right, I think it's the government's turn. We'll hear from Attorney Head. Good morning, Your Honor. May it please the court, Carol Head for the United States. I can't hear you. You can't hear me? Hardly. Oh, I'm sorry. I'm projecting as loud as I can. Does that help? Can you turn the volume up on your computer, please? I will try that. I'm using an iPad here. Is that better? Much better, thank you. And they're blocking Judge Barrett again for some reason. Thank you. So, just briefly touching on the sufficiency of the evidence and the Larrabee factors, I think Larrabee sets forth a myriad of factors that I believe the government has established and support the convictions in this case, specifically as to Mr. Wong's supervisor's testimony was that they received, the study wasn't blinded. Merrimack had raw data coming in on monthly sets. That was sad about the study. And what Mr. Wong was using this raw data to develop statistical programming that would analyze the final data set. So, there is no question that he had access to data about the MM398 studies during this time that there was evidence of that. Mr. Horstman also mentions the fact that Mr. Tan… Before you switch off of that, could you just address his materiality point about that data? Sure. So, I mean, the materiality point is, I believe what Mr. Horstman would like the court to adopt is to say that unless the evidence is statistically significant, it is not material. But here, I don't think that's correct. The study wasn't blinded. So, he could see the actual results, i.e. what arm the patient, one of the three study arms the patient was in based on the data that he was coming in. So, it was possible for the biometrics group, which Wang was developing the statistical programming software to analyze, to draw preliminary conclusions from the data. So, in that sense, I think it's absolutely material at that time. I'm sorry. In order to create the program, would he necessarily have had to have known the relevance of the data in order to create the computer program? I mean, Your Honor, I don't know the details of that, but I would say that the testimony was that he developed statistical programming for the purpose of analyzing the results, and he was using actual study data to do that. So, I think the jury, it was a reasonable conclusion based on the fact that also the study design protocol, which we included in our supplemental government appendix, specifically noted that the biometrics group would have early access to study information here. But you added one fact in response to Judge Thompson. I want to make sure that evidence actually shows that. If I understand it, you have evidence that they were designing the study to be able to analyze the data and that he had access to the data. But is there evidence that he relied on the data for the study? My recollection here is that the testimony of Mr. Belanger was that he was using the data to be using this data for the statistical programming. So, I think that answer your question, Your Honor? Not entirely. It makes a difference because if he could have created the program without understanding the significance of the data, then that supports the appellant's argument, or it may support the argument. So, that's why we're trying to pin it down. Okay. Or maybe it didn't come up at trial. That's what the argument is. It didn't come up at trial. Yeah. So, I know that the testimony was that members of the team, including Wong, would have access to the individual patient data, which would allow them to see which treatment arm the patient was assigned to. The study was coming in monthly. Wong was preparing the statistical programming and that Belanger testified Wong had access to the data and was working on software to allow for the statistical data analysis. But that does not include, then, any evidence that he relied on the non-public information for the study. I'm sorry. That he relied on non-public information for the study? Correct. What you just read, if I understand it, is that he had access to data at the time he was producing a study and that the study would allow him to then analyze the data. But the testimony you just read does not suggest that he relied on the data coming in for the study or that he needed to. I believe that, looking at Mr. Belanger's testimony as a whole, that the data was certainly confidential information, okay? And it was not public. And that he was using that data to prepare the statistical programming to analyze data and to determine preliminary results of the study. And you could see which arm a patient was in. So then you could see whether a patient in an arm that was getting the treatment, the drug treatment, was how that patient was doing. But you just keep saying he used the data. I guess I'm just wondering, is there anything in the Belanger testimony that says he used the data as opposed to had access to it? Or that to produce the study he would have had to have used that data? I think that... At least we know about it. The reading of Mr. Belanger's testimony is that he was using the data to develop the... The reading of it. Is that because the words say that he used the data or because it doesn't say that, but you'd like us to read it that way? I don't have his exact words, but... So I'm not going to... I don't have his exact words at the top of my head, so I can't precisely... So Mr. Horstman also talked about limit orders and that if you... Basically, the supposition was that if you trade using limit orders, you can't possibly be committing insider trading. And I just don't think that's fair, nor does it fit with this case where the defendants kept going back and retrying and increasing amounts using limit orders. So that doesn't... The trading pattern is that they continue to trade in greater, greater amounts in this stock or try to purchase and did trade. And Chan ultimately bought $1.5 million of Merrimack stock during this time period. Can I just ask one last question about materiality? Suppose the evidence was that access to the data and the evidence was that he was producing a study or a program or something that would have enabled him to analyze the data at the end. And suppose further, there's no evidence that he was using the data that was coming in from the M398 study to produce... From the M398 trial to produce that program. Okay, suppose all of that is what the evidence shows. Would just seeing the data of M398 study at the stages that he saw it as of November 2013 have constituted... Would that information from the M398 study at that time have been material, non-public information? It clearly would be non-public information, but would have it been the record shows that it would have been material if all that he did was just saw that data? All that he did, saw that data. Well, he saw the data, he would have known that... The testimony was he could tell the treatment arms, right? So he could tell which patients were getting the treatment and presumably could make some at least preliminary conclusions about the results. How? That's what I'm trying to figure out. How would knowing someone's in a particular treatment arm provide a basis for making any assessment of likely outcome? Because you could see how well they were doing. I mean, you know, you can... Five minutes remain. So are you saying that he could see which patients were being provided with the medication and which patients were in the control group? Is that what you're saying? Yes, that I believe is what Mr. Ballenger testified. Go ahead. I'm sorry. Go ahead. Go ahead. And so therefore you're saying that because he knew who participated in the group that was actually getting the experimental drug, he could take a look at it and determine that there was a success rate? I mean, is that what you're saying? That's, I think, the inference that can be drawn from Ballenger's testimony. I'd also add that... So the statistical analysis plan explicitly stated that Merrimack personnel will not have access to the randomization code, but in the course of data cleaning and statistical programming development, limited Merrimack chemical and biometrics personnel may view data for individual patients that could be unblinded due to the uniqueness of the visit schedules for each arm. Yeah, but we're trying to get a link between, okay, so I now have access to the unblinded data, and either that might help me produce a program from which I could generate predictive results and then trade on it, or just the access to the unblinded data itself might give me preliminary reads on the outcomes that I could trade on. If we don't think there's evidence showing that they needed to look at the unblinded data to produce the program, then all that we're left with is, well, access to the unblinded data might itself have provided a basis for making predictive assessments, but what in the evidence shows that just getting the access, that shows that they had access to the unblinded data, but is the nature of that unblinded data such that you could make a predictive assessment of who was likely to succeed in the trial and who was likely to fail? So, the testimony was, in the data, the unblinded data, you could determine which treatment a patient was getting, Mr. Ballinger testified, yes. But if I know that patient A is getting treatment and patient B isn't, but I don't know how they did, how does that help me? But I think the whole point of the statistical program that Long was using to develop this data was to determine the efficacy of the drug versus the two other arms, you know, the other arms. So, it would, you would have to assume that he would be able to have, the point of the statistical programming was to determine the drug's efficacy, right? At what stage in the trial? As, as it was going along, because he was testing and developing the statistical programming. I just, I didn't know if your honor wanted us to touch, me to touch on restitution before, I think my time is almost up. I didn't hear what you said, counselor. I'm sorry. Does your honor, your honors wish me to touch on any of the restitution No, I'm not hearing anything. I'm sorry. Can you hear me now? Yes. Okay. Do you, do you, does your, do your honors want me to, my time is almost up, or if not, it's probably up, but do you want me to touch on restitution at all? I just wanted you to answer Judge Barron's question. I, I've tried, I've tried. I'm, I'm, I'm, I, I think the evidence supports that he had access to material non-public information and as part of the conspiracy, you know. Well, we're just trying to figure out, he, it's undoubted he had access to non-public information. Correct. And I just, we're just trying to figure out what is the theory of why the information he had access to that was non-public is material. Some of that just depends on what materiality standard is as a legal matter. And then what the evidence shows that would support that legal standard. That's what I'm just trying to figure out. Okay. And I'm sorry if I'm not helping you. I think that the, I mean, you know, in my mind, would the market care about knowing about how, you know, the, the results of the, not the results of the study, what was going on with the treatment and the study. I think the market would care about that. So even if it wasn't yet statistically significant, because the study hadn't been finished, you know, the preliminary indications are that patients are doing well, not well, that's the, you know, to be drawn from the. That's time. Okay. Thank you. I would like to ask counsel for a pellet, a question. Do you believe that all the factors in, in Laramie are to be weighed equally, or do you believe that some are, are more intelligent, more weight than others? I turned my mute on and off. So I just want to make sure you can hear me again. Yes, I can hear you. Okay. I think they're entitled to equal consideration, but I think if you're going to compare them to Laramie, each and every factor here is weaker than Laramie from, from start to finish, whether it's. You think they should be weighed equally. That was my question. Thank you. Yes. Thank you, Judge. That concludes.